Yes, good afternoon. Good afternoon. Hold on a second. All right. Please call the next case for argument. All right, and Mr. Alanya, we'll hear from you first. Thank you, your honor. May it please the court and good afternoon, my name is Steve Alanya and I along with Chris Schmidt represent the appellant Mr. Vlad Dubikovskyy, the child's father and the petitioner below under the Hague Convention on the Civil Aspects of International Child Abduction. This court should reverse the district court's order denying the child's return to her home country of Switzerland on the sole basis of the narrow mature objection exception for two reasons. First, the text of the convention requires proof that the child affirmatively would find it unacceptable to return to the home country. A preference to remain in the United States, even a strong and convincing and well-reasoned one does not satisfy this showing. And second, the adopting parent failed to establish her burden of proving that the child would find it unacceptable to return to Switzerland and in fact, nothing in the record supports such a finding of unacceptability. The district court therefore erred and applied the wrong legal standard when it allowed the child's preference to remain in the United States to substitute for the narrow mature objection, the condition of unacceptability that the text of the Hague Convention requires. That's why we're asking this court to reverse and hold that the child should be returned to Switzerland so that her best interests can be determined by the courts of her home country. Counsel, would you address that difference between an objection and a preference? It's not clear in my mind what the legal difference is. In your view, what is the distinction between the two? Certainly, your honor. I think the key difference is that under a preference, living in either country would be acceptable, and under an objection, returning to the home country would be unacceptable. And I think the Fifth Circuit does a really good job of laying this out in a 2016 mature objection case called Rodriguez v. Yanez, and so I think it's actually worth quoting that portion of the opinion, which is just a few sentences. There, the court looked to the text of the convention as the Supreme Court directed in Abbott v. Abbott and explained, quote, the text of the convention restricts the age and generation to cases in which the child objects to being returned. A preference is not an objection. This is not a matter of magic words or talismanic language. There is a substantive difference between preferring to live in one of two countries when living in either country would be acceptable, and affirmatively objecting to returning to one country when living in that country would be unacceptable. Only an objection is sufficient to trump the convention's strong presumption in favor of return. And so ultimately, when this court blessed the reasoning of Rodriguez v. Yanez and the only published opinion of this court to apply the mature objection exception, Judge Kelly's opinion in Custodio v. Simillion, also from 2016, this court should hold that the stricter standard applies when, as here, the mature objection is the only basis for denying the strong presumption of return under the hate convention. We did not really say what that stricter standard is. What do you think that is? What does that mean? That's correct, Your Honor. I think this case gives the court a good opportunity to expand on what that stricter standard means. And I think it also presents the opportunity for this court to expressly adopt the reasoning of the Fifth Circuit and Rodriguez, noting the substantive difference between a preference where either country is acceptable and an objection where the home country is unacceptable. So I think... And that sort of seems to be the nub here, which is, I think it's a challenging question here, preference versus objection, when I think this is an example of the case where they sort of bleed into each other. But other than that, sort of making sure that we honor that aspect of the convention, do you have a theory on how it's a higher standard than just making sure it's an objection and not a preference? I think that it should require the district court to really spell out its explanation if it is going to rule only on the mature objection exception and deny the strong presumption of return, which is what the district court here did, then it becomes incumbent on the district court to really show how it's applying that standard strictly. So I think it needs to explain, you know, there might be some overlap or some gray area between preference or objection, but this really is objection, and here's the reasons why. The problem is, here, the district court not only conflated those two standards or allowed them to bleed into each other in a way that impermissibly expanded what should be a narrow exception to return, but also there's nothing in the record showing that the child here would find it unacceptable to return to her home country of Switzerland. Counsel, if you'll help me, is the preference, objection, distinction, is that in the Fifth Circuit only or is that from the text of the Hague Convention or the federal statute? Where is that coming from? So the Fifth Circuit rooted that distinction in the text of the Hague Convention and the word objection and how it is substantively different from a preference and looking at the structure of the Hague Convention as well as the Supreme Court directs courts to do from the Abbott decision. So because the Hague Convention requires a presumption of return whenever there's been a wrongful removal, which the abducting parent concedes here, the exceptions to return have to be construed narrowly. So that's what the Fifth Circuit relied on, but the Fifth Circuit is not the only court to require this strict preference versus objection standard, and in fact, there are a number of other courts laid out in our brief that hold an abducting parent's that same standard, and in fact, a number of other countries listed in our reply brief as well require that same showing to distinguish between an objection and a preference. So it's rooted not only in the text of the convention, but also a number of courts have recognized that substantive ... So what is the testimony in the record that suggests that the child returning to Switzerland would be ... I think you used the term acceptable. Is that right? I mean, what does the record show on that? Yes, Your Honor. So to begin small point, it's actually the abducting parents approved that it would be unacceptable and not the left behind parents approved that it would be acceptable. But here we actually do have affirmative evidence in the record where the child testified that she would be okay if she were returned to Switzerland. On page 238 of the trial transcript, she explained that she had no concerns for her safety, that if she were returned to Switzerland, she understands she would be well cared for, she would get enough to eat, she would feel pretty safe in Switzerland, and a lot of ... So does the objection go, and I don't know the answer to this, does it go to these sorts of physical safety issues where the child would be, as you said, okay in a physical sense? In other words, I won't be abused, I'll be well fed, I'll see the doctor. Is that the extent of the range of objections or where do we draw that line? Or was there more in the record here maybe? Well, Your Honor is right. I don't think that that exception is limited to the same kind of concerns underlying a separate exception to return, the grave harm exception that the district court found was not applicable here. I think just theoretically there could be instances where a child explains, for example, I'm a young woman and in my country young women don't have opportunities to go into certain professions. I find that unacceptable. How about the child's ... I'm sorry, I think it's a tough issue. How about the child's sister, I think in this case being in Missouri, being separated from a sibling. Is that an objection or a preference? Your Honor, that is something that the child raised in this case and I don't think the record supports showing that that rises to the level of the child here finding that it would be unacceptable to return to Switzerland for a couple of reasons. First, I think there's a helpful case that actually explains this recently from the Eastern District of Missouri, which I submitted under Rule 28J that was decided after we briefed this case. There, the court applied this court's stricter standard in looking at the mature objection exception when the child raised the same kind of reasons for wanting to stay in the United States, namely that she was really close to the abducting parent side of the family that was here in the United States. The district court in that case correctly explained that that's derivative of really a preference to live with the abducting parent. That's the kind of consideration that the Hague Convention prohibits district courts from giving credence to. Even if there's a really strong preference to remain with the side of the family that's within the United States, that does not necessarily show that the child would find it unacceptable to return to the home country and in fact would really only reward the abducting parent for the act of crossing international boundaries in search of a more sympathetic court. So what sort of examples can you give me other than the actual dangerousness or harm that might be an example of an objection rather than a preference? So I think an example that I alluded to earlier where for some reason there might be something preventing the child because of an identity she has or something from being able to enter into certain professions or being able to go to universities in the home country because of her gender. Something like that would not rise to a grade. So is that in the text of the convention or, and again, I think it's a tough issue. So in other words, is that what the convention actually says that it's that limited? No, and in fact the text of the convention just requires that a child objects to being returned, which the fifth circuit found means has to be unacceptable to return to that home country. And I think that's the key consideration is whether it would be unacceptable, whether the child would find it unacceptable to return. And here I don't think there's any evidence in the record that the child would find it unacceptable. She might have a strong- I'm sorry, I'm belaboring the point. So it would be unacceptable, for example, not to enter a certain, you know, to object because if you're returning to your home country, you couldn't enter a certain profession, but not because you would be separated from your sibling or siblings. Is that your kind of takeaway from the fifth circuit and the convention? I think that's correct, Your Honor, if the desire to not be separated from the abducting parent side of the family is derivative of really a preference to live with the abducting parent. And that's kind of what the Bada Charjee case that I submitted under 28J really parses out in a helpful way, I think. There are some other cases cited in my reply brief, especially the Heimdall's case from the second circuit does the same thing in really explaining why a preference to stay, even a sincere desire to stay with a family in the United States cannot necessarily show that it would be unacceptable to return to the home country. And it is, you know, these are difficult cases, and I'll certainly admit that these are fraught with emotion, and it's difficult to see a child in the middle of a custody dispute between two parents that has been going on for so long. But ultimately, here, both parents have been litigating custody issues since 2017 in the Swiss courts. And time and time again, the Swiss courts have held that joint custody is proper and that both parents have a right to raise their daughter in Switzerland. And when the abducting parent here became dissatisfied with the results she was getting in Switzerland, she admitted to lying to the father and creating a plan to bring the child to the United States to try again in a different court system. But that's exactly what the hate convention is designed to prevent. As this court held on Bonk in the Silverman case, the hate convention is designed to prevent parties from crossing international boundaries in search of a more sympathetic court. Unfortunately, the district court provided a more sympathetic court when it adopted the wrong legal standard in its interpretation of the word objection. And that's why we're asking... Counsel, there's also no real limitation on the type of objection though, correct? So you've sort of talked about a preference for a family or a certain parent. It's hard to sort of walk that line between, again, what Judge Kobus has sort of been exploring with you. But I also find it challenging to, in this case, to talk about... But I'm not convinced that the courts are to look at the nature or the type of objection that the child, the mature child, has lodged. Do you? I think that's right, Your Honor. And I think that it's true that the hate convention does not specifically say the type of objection a child has to lodge to prevent the presumption of return. But I do think that looking to the structure of the hate convention and its strong presumption of return, as the Fifth Circuit explained, means that a district court has to be really careful in making sure that the child is not just expressing a preference to live in the United States with the abducting parent. And I think that might be another example of kind of the marginal difference between the stricter standard that this court required in the custodial decision. And I see I'm running low on time. Unless the court has further questions, I'll reserve my remaining time for a short rebuttal. You may. Thank you for your argument. Mr. Comey, we'll hear from you. Good afternoon. Thank you for having me in today. I wish we'd all been in person together in the same room. But I would like to bring to your attention that this case should be affirmed under the general rule for any reason. And moving on, it is not a law case, it is a fact case, where the district court is granted wide, wide discretion in interviewing witnesses and conducting in-camera examination of children which go on daily in our courts in the United States. This district judge who conducted this case was the prime example of who should be teaching the Hague Convention at the Administrative Office of the U.S. Courts. She understood the guidance that you provided in the custodial case and she followed it. She followed it to the letter. She provided opportunity for the lawyers to have input at every step of the way. She heard from us in person. We were not sending motions in to be decided and returned on an order, but we were actually talking to her directly. She provided an opportunity for lawyers to provide their thoughts on what should be done and how that should be done. And if you review the record, you will see that she was very open in that regard. With respect to the child, if we look at her memorandum of opinion. You know, I have a question in terms of teaching the Hague Convention at the Administrative Office of the U.S. Courts. If we affirm in this case, would this be a good teaching tool for abductors on how to If you bring the sibling, get them a pet, get them a big house, and the child naturally would say, I love the big house and I want to be with the sibling and I love the dog and I would be upset going home. That's all it takes. Wouldn't that be a consequence of affirming here? No, it would not. The presumption under the Convention and most of the cases is automatic return. Virtually automatic return. This is like a super rite of habeas corpus. If you jump the boundaries of the countries and you come here with a wrongful purpose, in 95 to 98% of these cases, the child is returned. Well, unless the abducting parent has the means to buy off the child, right? I don't understand that question because there is no testimony in the record. Well, in other words, Judge Palatin suggested that there was a big house and you could bring the child and you could offer pets and other things. Doesn't that provide the opportunity for, in particular, people with means to violate the convention because they can provide the sort of lifestyle that a child might prefer? I don't agree that that is true based on the evidence that was heard in this case. It wasn't a means testimony. It was a life plan testimony to become a veterinarian. It was a plan to think in terms of care for her little sister. It was a plan to be involved in pets and veterinarian activities, to volunteer at the University of Missouri, to get ready to become a veterinarian. In other words, this child had the kind of goals like a person who goes to, takes English and pre-law courses. She had the ideas of an adult as to what she wanted to do. She was found to be a mature child. I don't hear any of that. So counsel, I'm struggling with this, but is it the parent then who provides more social and career opportunities that has the advantage in this situation then? No, it's not the parent who provides it. It's the goal of the child. It's the child articulating the goal of the child. But the child can achieve it only because here the mom can offer it and presumably the father cannot, right? Well, the mom did not offer it. That was not the testimony. The child didn't say mom offered me this, that, or the other thing. In fact, the judge found the mom didn't influence the testimony. Counsel, please. She could achieve these goals in Missouri, right? And not in Switzerland, or am I misreading the record? Well, she, the child, I don't believe you're misreading the record. I never suggest that to a judge sitting where you're sitting. But I would say that another construction of the same record is that the child perceived that this was the career path that the child wanted to perceive. And the judge found her to be extremely mature and beyond her age. After all, she was reading Jack London. Where does the child talk about career paths? Can you point me to that? If you look at the district judge's order and you follow... So I'm talking about the testimony of the 12-year-old. Where does she talk about career paths? She referred... That's referred to in the district judge's order. I can't give you the exact pinpoint citation to the record, but... I don't find anything about career paths. She does say that she'd like to go to college eventually. And she talks about going to college in the United States. You're correct. That was my choice of words, was career paths. I may have... It wasn't the child's choice of words because she doesn't think like a 73-year-old. But she thinks like a kid. And she articulated within the language of a child whose primary language was French and her secondary language was English. And she speaks four languages. I think she did say she wanted to be a veterinarian. Is that right, counsel? Yes, sir. Is there any evidence she couldn't be a veterinarian if she returned to Switzerland? No. No evidence about that in the record. Let me ask you a more general question about how this should work. Suppose you have two children, same age and same situation, and one of them says, I really love the big house and I love the dog and I love being with the little sibling or the cousin or whoever else is brought by the abductor. And I'd be really upset if I have to leave that situation and go back to the home country. And then you have another kid who says, well, I prefer the big house and the dog and the sibling like any other kid would, but I can buckle up and get along just fine back home with dad in the smaller apartment if I have to. Should those cases come out differently? Well, they're all so specific to the individual facts. In other words, each one of these cases turns on an individual family and the individual testimony of the individual family members. Now I just got back from Montana where the older child had timed out of the convention and she was definitely staying and the younger child was going back. So it really depends on which family you're talking about, who is the witness on the witness stand, who's testifying, how they testify. And the other thing that we haven't mentioned yet is the district judge looks at these children. She actually looked at this child face to face. She could see if the lips were quivering. She could see the body language. She had an opportunity to evaluate the child's words firsthand and that's why they're given such wide discretion at this point because you don't have a video of the in-camera interview. You don't have the ability to be Howard Cosell recalling the game. But we do have a transcript where the judge was trying to see if the child would say she objected and the child couldn't even say that. She said, I don't... That's because the child... Pardon me, go ahead. No, I don't mean to interrupt you, please. What I was about to say is the child was thinking in French. It was obvious from the transcript the child was thinking in French and the word object in English has two different meanings. It has two different ways of seeing it. Lawyers object as much as they would pull the change out of their pocket. It's automatic, it's reflexive. But a 12-year-old doesn't say, Mom, I object to having yogurt for breakfast. It's... The child is primarily a French speaker. And so the child, even though they speak German and Russian also, this child expressed herself and the district judge followed up very closely on what was going on in that chamber. And look at the way the judge followed your leadership in the Castillo case. That judge had one interview with the lawyers present and the lawyers participated in the first interview. And then she sent this child to the psychologist and the psychologist evaluated it and turned in the report. And then she called the lawyers back together and said, Do you guys want to add anything else to the record? Do you want to offer any other evidence? Do you want to do anything else? And then she had another interview with the child by herself. This judge followed your guidance 100% because that's exactly what happened in your central case, which is the leadership of the circuit, which is Castillo. You've mentioned the expert that was appointed. At one point it seemed that the district court was appointing that expert to make sure there was no undue influence from one parent to the other in the testimony. But then the expert sort of spilled in a little bit to kind of maturity and which I think sort of then reflected in the objection because he started talking about whether or not she could form her own opinion. So in your view, how did the district court weigh that expert opinion? Was it just for the undue influence or was it actually playing into her ruling on whether or not what this child said was an objection or a preference? My memory of her order was I think the sentence started out that she appointed him to avoid the potential for coaching or leading or undue influence on the child. That I think was the beginning of the sentence in the order, if I remember correctly. And then she went on to indicate that he was supposed to give her guidance on the psychological maturity of the child and also whether or not the child was capable of providing guidance to the court on her desire not to return. So I think all those things were in the mix and typically in courts throughout the nation, we appoint psychologists and psychiatrists on a regular basis to assist the court as the court's expert in some cases and other cases. And by the way, this court exercised its authority under the federal rules of evidence to obtain that and there was no objection. What role would the doctor have in determining preference versus objection? Capability to make a decision. In other words, the mere ability to think to make the decision. Not what the decision is, for sure. It's not weighing in on the decision. It's weighing in on the maturity of the child psychologically to make the decision. Does that answer your question? Yes, but that's a different part of the test though, right? You have to be of an age and maturity to make the objection. In other words, and maybe I misunderstood, but my impression was that the parties were really only contesting or battling out at this point the objection part and not whether this child was of an age and maturity that she could make an objection. I think your analysis is correct. I think when I read the briefs, we were down to the question of how did the district judge exercise her discretion and on what basis did she do so? If I may turn to a point, as my time is expiring faster than I'd like it to, and that is on the letter that was sent in on the new case from St. Louis, which appeals to be Batahatchee, I believe. I mispronounce words because I'm bilaterally hearing impaired. Bottom line is because the M1 rifle didn't come with free earplugs. Looking at this case, that district judge relied on our district judge's case in multiple points to point out the difference between the two children, the child she was looking at, which she found not to be sufficiently mature and having childlike reasons for not wanting to go back to Singapore, and comparing it to our judge who had a mature child in front of her and all the reasons that that mature child stated for not wanting to go back to Switzerland. That case, as I looked at it, was a case that supports my position which is that that district judge found the reasoning below to be persuasive. While that may not push us over the top here, you can affirm for any reason and there are many reasons from what that child said in the record why this case should be affirmed. I thank you for listening to me today and I wish that all of us have a better year next year. Alright then, thank you for your argument. Mr. Alanya, you have a little time remaining for rebuttal. You may proceed. Thank you, Your Honor. Very briefly, a couple of points. My opposing counsel ended his argument saying there are many reasons in the record to affirm but he did not name one reason showing that the child would find it unacceptable to return to Switzerland. It's especially important for this court to hold district courts to that stricter standard because of the well-documented phenomenon where abducted children internalize the wishes of their abducting parents. Counsel, did the expert here suggest that there was no sort of improper influence? In other words, the district court spent quite some time addressing that very issue which is an obvious concern and it was an obvious concern for the district court and one might suggest the district court went above and beyond to address that specific concern. Your Honor, I see my time has expired if I may briefly answer your question. You may. Thank you. A couple of points to that. First of all, the statute puts the burden of proof on the abducting parent to prove maturity and so the district court's extra steps of hiring a sua sponte expert and conducting another interview actually improperly relieved the abducting parent of her burden of proving the elements of this narrow exception. Secondly, even if the district court could infer from the expert opinion, which I think is equivocal on the point, the fact remains that it would still be for the child to show that it would be unacceptable and this court's concerns about providing a blueprint for abducting parents or maybe even a perverse incentive to coach children into avoiding saying they would be okay returning to the home country is exactly what's at issue in this case and that's why we're asking this court to reverse. All right. Seeing no other questions we thank you for your argument. Thank you to both counsel. The case is submitted and the court will file a decision.